**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 19-115 |
| | ) | Judge Nora Barry Fischer |
| MICHAEL PHAN, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

### I.      INTRODUCTION

In this case, Israeli citizen Michael Phan is charged with one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  (Docket No. 6).  The grand jury alleges that Phan participated in an alleged conspiracy with codefendant Tal Prihar, darkweb administrators and others known to the grand jury through the operation of DeepDotWeb, a website which provided links to darknet marketplaces where narcotics and other illegal materials were bought and sold by individuals on the dark web and for which the company received millions in cryptocurrency payments for its referrals.  (*Id*.).

The Indictment was returned on April 24, 2019 and international arrest warrants were issued for Phan and Prihar, who is also an Israeli citizen but was living in Brazil at the time.  (*Id*.).  Prihar was arrested in France in 2019, extradited to the United States, pled guilty on March 31, 2021, and was sentenced by the Hon. Donetta W. Ambrose, (Ret.), on January 25, 2022 to 97 months' incarceration, no term of supervised release, a $100 special assessment, and forfeiture of accounts and currency worth approximately $8.4 million.  (Docket No. 74).  Phan remained in Israel and challenged extradition for approximately 6 years before he was finally extradited to the United States in the fall of 2025.  (*See* Docket No. 116 at 2).  Phan then pled not guilty at an initial

appearance before U.S. Magistrate Judge Maureen P. Kelly on October 24, 2025.  (Docket No. 103).

After a detention hearing was held on October 29, 2025, U.S. Magistrate Judge Patricia L. Dodge ordered that Phan be detained pending trial after finding that the Government demonstrated that there is a serious risk that he will flee if released and that there are no conditions or combination of conditions of release that will reasonably assure his appearance as required. (Docket No. 107).  Magistrate Judge Dodge relied upon findings that: Phan is subject to a lengthy period of incarceration if convicted; lacks significant family or other ties to the community; has significant family or other ties outside the United States; lacks legal status in the United States; and, lacks stable employment.  (*Id.*).

Presently before the Court are Phan's Motion for Revocation of Detention Order under 18 U.S.C. 3145(b), (Docket No. 116), the Government's Brief in Opposition, (Docket No. 119), Phan's Reply, (Docket No. 125), the Government's Sur-Reply, (Docket No. 132), and Phan's Response to the Sur-Reply, (Docket No. 138).  This Court has conducted a *de novo* review of the detention order and the record below which includes the transcript of the detention hearing, the testimony of FBI Agent Micah Mayotte, defense witnesses Guy Elbaz (who appeared remotely by Zoom) and Yaron Barzilay (who appeared in person), the exhibits presented by the parties, and the Pretrial Bond Report.  (Docket Nos. 99; 109).  The parties have also supplemented the record with additional exhibits and proffers.[1]  (Docket Nos. 116; 119; 125; 132; 138).  After careful consideration of the parties' arguments in light of the evidence of record, and for the following reasons, Phan's Motion [116] is denied, the detention order is affirmed, and Phan will remain detained pending trial.

---

[1]     Defendant also submitted a Notice of Inquiry Into Status of Pending Motion for Revocation of Detention Order on February 22, 2026 which provides no further factual or legal arguments.  (Docket No. 144).

II.    BACKGROUND

The record developed during the detention hearing establishes the following. Phan is currently 41 years old. *Pretrial Bond Report* at 1. He was born in the former Soviet Union and immigrated with his family to Israel when he was around 8 years old. (*Id*.). He is an Israeli citizen. His parents and brother remain in Israel. (*Id*.). He has never married and has no children. (*Id*.). Phan has no legal status in the United States and is subject to a detainer from Immigration and Customs Enforcement ("ICE"). (Docket No. 109 at 89). He has an Israeli passport which is currently in possession of the Butler County Prison, where he is being held in pretrial detention. *Pretrial Bond Report* at 2. He has previously traveled internationally to the United States, the United Kingdom, Brazil, Romania, and Russia-which does not have an extradition treaty with the United States. (*Id*.). Phan's travel to the United States included separate trips to Las Vegas and Miami in 2018 or 2019. (*Id*.). He has some cousins who live in the United States but no relatives or friends in the Western District of Pennsylvania. (*See Pretrial Bond Report*; *see also* Docket Nos. 109; 116; 125).

With respect to his employment record, Phan told Probation that he has been unemployed since 2021. *Pretrial Bond Report* at 2. He previously worked in Israel as a lecturer from 2014-2021 and operated a vending and coffee business from 2009-2021. (*Id*.). Although he was not working, he had been attending law school in Israel and completed his studies in 2025. (*See* Docket No. 116 at 4). He claims that he does not have significant assets as he has filed for bankruptcy in Israeli courts, his Israeli assets are controlled by a trustee, and he has liabilities of up to $10 million as a result of the failed coffee business. (*See Pretrial Bond Report* at 2-3; *see also* Docket No. 116 at 18). With that said, Phan states that he earns $2,450 per month renting an apartment in Tel Aviv and he also owns a multi-acre real estate parcel in California that he

purchased in 2018 and is now worth approximately $380,000.  (*See* Docket No. 116 at 2, 18, n.6, n.7).  Phan also concedes that 30 Bitcoin were seized from him as part of the instant case.  (Docket Nos. 109 at 19; 116 at 6, 17).

Phan has no prior criminal convictions, but he is charged with tax and money laundering offenses in Israel arising out of the present scheme.  (Docket No. 116-3 at ¶ 15).  Those proceedings are ongoing, even after his extradition here. (*Id*. at ¶¶ 15-19).  Phan proffers that the potential penalties for the Israeli offenses include up to "hundreds" of years in prison.  (Docket No. 99-4 at 2).  The record reflects that as part of the proceedings in Israel in 2019, Phan was initially released on bond with strict conditions including electronic monitoring but those conditions were generally relaxed by the Israeli courts over time, with the electronic monitoring condition removed and the conditions reduced to his reporting twice weekly to a local police station.  (Docket No. 116-3 at ¶¶ 4-14).  There is no indication if Phan was subject to internet restrictions during this time period. (*Id*.).  It is uncontested that Phan made every necessary court appearance, met with Israeli officials for required interrogations, and did not commit any violations while subject to the bond conditions imposed by Israeli courts for a period of more than 5 years.  (*Id*.).  He also self-reported for extradition to the U.S. after he lost his appeals in Israel contesting the extradition.  (*Id*.).

It appears that Phan has broad support from family and friends, all of whom live outside of this District and most of whom live abroad.  (*See* Docket Nos. 116-2; 116-7).  His parents wrote that they were willing to put up a $100,000 cash bond and their personal residence in Israel to secure his release.  (Docket No. 116-7 at 3-4).  (They previously put up this residence to secure his release on the charges in Israel).  (*Id*.).  Two individuals testified on Phan's behalf at the detention hearing that they would be willing to serve as third party custodians from afar: Elbaz, a friend who lives in California and has known him since 2016 or 2017, who visited with Phan a

few times and attempted to do business with him; and, Barzilay, a U.S. citizen who lives in Israel, met Phan in 2019 and represented him in the Israeli criminal proceedings. (Docket No. 109 at 46-60). Both told the Magistrate Judge that they would be willing to come to this area once a month to ensure Phan is complying with conditions if he was permitted to live in an apartment in downtown Pittsburgh he had hoped to lease. (*Id*.). Barzilay expressed that he would resign as Phan's counsel in the Israeli proceedings and expected that Phan would work with him on a case for another client who was facing extradition. (*Id*. at 54). Barzilay was unaware that Phan did not have an appropriate visa authorizing him to work in this country if he were to be released. (*Id*. at 59-60). The Government was unsatisfied with these proposed arrangements and continues to seek detention pending trial. (*See* Docket Nos. 119; 132).

At the conclusion of the evidentiary presentations, the Magistrate Judge accepted additional proffers from counsel, heard oral argument from them and then ordered that Phan be detained pending trial. (Docket No. 109 at 60-91). The Magistrate Judge made the following findings in support of that decision:

> [A]s I mentioned at the beginning, the government is seeking detention based upon its assertion that there is serious risk of flight, and I am considering their request on that basis. That requires a preponderance of evidence that there are no conditions or combination of conditions that will reasonably assure Mr. Phan's presence here in this court to respond to the indictment that has been returned by the grand jury.
>
> As everyone has pointed out, I am required to consider the factors of the Bail Reform Act, and I appreciate counsel's references to those throughout their arguments. I'm going to turn to each of those in turn, starting probably with the factor that is not relevant here, and that is the danger to others in the community. This isn't a case here with respect to money laundering where we're specifically referencing a danger to the community. I'll get back to that later on, but I did want to reference that. This is not a crime of violence. I'll discuss the website in a little bit.

Turning first to the nature and circumstances of the alleged offense. The court, as everyone has pointed out, this offense is serious, to commit money laundering that arises from a website, the DeepDotWeb site that allowed, among other things, access to the dark web. Where individuals anonymously can link to various services and marketplaces, according to Exhibit 2, that marketplace and places that could be accessed, included access to a number of matters that are not in dispute here or not particularly controversial. But access to a market that included firearms, controlled substances, personal information of others, and what was represented as fraudulent documents, and in this regard, I'm certainly relying in part on the agent -- on the testimony of Agent Mayotte with respect to that website itself.

There was a significant amount of testimony about cryptocurrency and its role in these matters. Mr. Phan's role in the indictment is described as the day-to-day operator, and I'm going to say runner, but I think operator, perhaps a different word, of the website itself. We do know from the exhibits that Mr. Phan's co-defendant did plead guilty and was sentenced to 97 months incarceration. The testimony of the agent also referenced a series of shell companies that are also referenced in the indictment and the movement of funds between bank accounts in different countries.

We also heard from the agent, who I will note was not the investigating agent in this case, and his testimony on the review of the file that there was Bitcoin seized in 2019 from two separate wallets, that additional Bitcoin is believed to have belonged to Mr. Phan. There was an examination of the blockchain that traced funds from this -- from the referrals received through the operation of the website at issue, and that there is currently a wallet that includes, as I understand it, 570 Bitcoin, which represents millions of dollars of money.

I will note, as brought out on cross with respect to the nature and circumstances, that the website at question also has a number of other matters that one could apparently reference, including news articles and matters about gambling.

And I will, as I noted, reference that, as we sit here today, there is the indictment that was issued, and certainly there are circumstances that will be brought out as this matter proceeds here. So that is in a very brief summary, and not intended to be totally inclusive, of the evidence of the nature and circumstances of the money laundering conspiracy, which emanated from this website and included the

transfer and exchange of cryptocurrency to what is alleged to be various shell corporations and moved from place to place.

With respect to the weight of the evidence, there are certainly issues that were brought out on cross with respect to the agent's testimony, and certain information that he had no evidence to support. I will note that whether there is such evidence to support it is not a fact that I'm going to be able to reach any conclusions about here today, recognizing that the agent was basing his testimony on a review of files, not the investigation itself. But certainly, when we have an indictment, while that is not the sole determination of the weight of the evidence, the grand jury did conclude that there was probable cause to charge Mr. Phan. So I do find the weight of the evidence certainly here to be sufficient to support probable cause.

Turning to the history and characteristics of Mr. Phan's. We heard in part about that from both Mr. Elbaz and Mr. Barzilay. Mr. Elbaz testified that he is a resident of Los Angeles, and he's known Mr. Phan through mutual friends for about six or eight years or so. They have met several times. He considers Mr. Phan to be a friend. He stated that he was willing to serve as a custodian to vouch for Mr. Phan's appearance in court and would come to Pittsburgh as needed for that purpose. He essentially stated that, in his opinion, Mr. Phan would not violate any conditions that might be imposed in this court. He also acknowledged on cross-examination that he had no knowledge that Mr. Phan was allegedly involved in the DeepDotWeb.

We also heard, and I know Mr. Barzilay is here in this courtroom, I certainly appreciate his testimony here today, he came to know Mr. Phan when he was arrested in 2019, and served as his criminal attorney. If appointed as custodian he would, while he is willing to serve, he would no longer serve as Mr. Phan's attorney in Israel. Clearly he understood the duties of a custodian. He indicated that he would come to the United States once a month and was willing to keep Mr. Phan occupied through professional employment. He certainly -- it's clear to me that Mr. Barzilay has a very high opinion of Mr. Phan. But certainly he indicated that in the event there were some issues, he would, in fact, do what he needed to do as a custodian.

We also heard that there is no Visa that Mr. Phan could work in this country if he were to be released. Looking to some of the other history and characteristics of Mr. Phan, we know that he has very strong ties to Israel. He certainly appears to be highly motivated to remain in Israel. I will note, as Mr. Canter pointed out, that there

was no evidence that with respect to what may be a parallel proceeding in Israel that he has failed to appear for court proceedings and cooperate. I note from the pretrial services report that Mr. Phan, other than perhaps parallel charges in Israel, has no other criminal record. I'll note that according to the indictment, the alleged money laundering is alleged to have occurred starting back in 2013. I am aware from the proffer, and also from the pretrial services report, that Mr. Phan has been engaged in other activities as a business owner, currently involved in a bankruptcy proceeding in Israel. He does have some assets here in this country, specifically property located in California, which allegedly has a value of about 380,000.

I did also hear and have read about health conditions that Mr. Phan has stated that he has, and that there are potentially some difficulties in him participating in his defense if he were incarcerated, which I will note I acknowledge, and certainly would want any defendant to have access to medical treatment, their attorneys, and anything else that is permitted while incarcerated. And certainly, I have made efforts in cases to make sure that that happens.

I will note that the courts in Israel have imposed conditions and then relaxed those conditions, according to the exhibits that were offered by Mr. Phan's counsel, which reflect certainly that he has maintained the conditions that were imposed by the court there.

In terms of other history and characteristics, I know I'm providing a very brief summary, but we do know that an apartment apparently has been secured for Mr. Phan here. He does receive some rental income. Mr. Barzilay indicated that he would provide work for Mr. Phan, but we're not confident that that work could actually be performed for Visa issues. I do agree the fact that […] there is an ICE detainer, isn't a factor in my findings here today, and I certainly don't have enough evidence or information about it to make any other statement. But it's certainly not sufficient to detain someone simply because of the existence.

I will note, and I'm going back for a moment, just to danger in the community. That really isn't a factor to be considered here, except that I will note to the degree that Mr. Phan, as he is alleged, had participation in the website that we talked about and conspired to money launder referral fees based upon that, the website itself, while it existed, offered recipients, or people who accessed that website, the ability to engage or purchase material that included fraudulent documentation, narcotics, and personal information about others. I don't know sitting here today the extent to Mr. Phan's ability to

access such information, but certainly that website created access to information that would permit one to obtain fraudulent documents or personal information of others. That's as much as I can conclude about that.

I do know that the pretrial services report makes a recommendation that there are no conditions to ensure Mr. Phan's appearance here in court. Obviously, that's a recommendation that I take seriously. I'm certainly not bound by it. But I do want to note that was the recommendation of pretrial services.

This is an interesting case in the sense that we have someone that has a parallel proceeding in Israel for which he has appeared as required and has not been confined.

Certainly, as a resident of Israel, Mr. Phan is, I would assume, highly motivated to remain in Israel, highly motivated to comply with the conditions of courts in Israel based upon his significant ties there.

He, by contrast, is here based upon an extradition matter, which he certainly had a right to contest, but contested nonetheless. And is here because those proceedings resulted in his appearance here in the court and his detention up until today.

He essentially, and I shouldn't even say essentially, he has no ties whatsoever to this jurisdiction. And I don't find that whether he has an apartment here that's close to the courthouse makes any real difference in terms of whether there is a serious risk that he may flee.

In addition to no ties here, and essentially not much ties to the United States, other than, as I understand it, he does have several relatives who reside elsewhere in the United States, he has little means, if any, to become employed in this country because he's not here on a Visa. That's not his fault. It's just the reality of the situation that even if he were to reside here, he would be unable to support himself other than potentially rental income from his half interest in an apartment.

I certainly appreciate and believe the sincerity of those who were willing to serve as third-party custodians and particularly Mr. Barzilay, who clearly has known Mr. Phan for a significant length of time and is willing to put himself out, including traveling here every month, to make sure that Mr. Phan complies with any conditions that I might impose. But despite that sincere goal on his part, which I have no doubt he would attempt to fulfill, the reality is that we have someone here in the United States with no ties to the

United States, with no employment, with, certainly, some financial means to leave, and little motivation to be here, unlike his significant motivation to be in Israel. I understand that. But I do believe that the custodians, despite their obvious sincerity, could not reasonably assure the appearance because they're not here. Because they have limited access to Mr. Phan. Because they would not be here in the event that he concluded that it was in his best interest not to face charges here.

And so while I appreciate their offer, I don't believe that having a third-party custodian who is not tied to this community and not tied to this court in a way that would be significant enough for me that, what their offers, while appreciated, are insufficient for me to find that they could serve in that capacity successfully, despite their best interests and despite their willingness to assist.

So, I think, in this matter, I don't believe there are conditions that could reasonably assure Mr. Phan's appearance in this court for the reasons that I have outlined. There are many conditions that I would typically impose, such as employment, that I don't believe could be fulfilled here.

There are other conditions that could not possibly be monitored by a remote third-party custodian, including, and I'm not suggesting there is any use of drugs, but a restriction from using any narcotics, and, yes, we have used electronic monitoring, but that's not a system that instantly gauges when someone may have fled. It is a record that is periodically monitored by pretrial services, and in and of itself, in my view, is not sufficient to secure the appearance of a defendant with no ties to this community, who has significant motivation not to be incarcerated here.

So, for all of those reasons, I am finding by a preponderance of the evidence that there are no series of conditions that will reasonably assure Mr. Phan's appearance at trial. And for that reason I am granting the government's request for detention and ordering him to be detained.

(Docket No. 109 at 91-101). Magistrate Judge Dodge then issued a detention order consistent with these findings on October 29, 2025. (Docket No. 107).

In support of his motion seeking to revoke the detention order, Phan now proposes that he be released to live in housing arranged by the Aleph Institute in Pittsburgh. (Docket No. 116).

Rabbi Moishe Mayir Vogel, Executive Director and founder of Aleph Institute Northeast states in a letter dated November 18, 2025 that it is "a Jewish humanitarian organization that provides religious and humanitarian services for inmates in prisons and jails across the Northeastern United States" and also "provide[s] vital social services to the local Jewish community, including food security programs and other essential support systems." (Docket No. 116-1 at 1-2). He adds that Phan can live at a residence with other unnamed individuals who are currently on state probation or parole and is monitored by the landlord, Ron Kashi. (*Id.*). He further notes that Phan can volunteer at the Aleph Institute and benefit from religious and non-religious programs that they put on for offenders, including classes and group sessions. (*Id.*). The defense proffers that Phan will pay $1,000 per month. (Docket No. 116 at 18).

Phan, alternatively, proposes that he live at an apartment in Fort Lee, New Jersey owned by a relative. (Docket No. 116). In this regard, Michael Davit, a cousin who lives near Miami, Florida writes that he is willing to let Phan live in this apartment. (Docket No. 116-2). Although Davit would remain in the Miami area, he volunteered another unnamed cousin to check in on Phan if he is released, as this individual lives in the same apartment building in New Jersey. (*Id.*). Phan advises that Rabbi Vogel, Kashi and Davit would be available to testify if a further hearing was conducted in this matter. (*See* Docket Nos. 116; 125).

In his filings, Phan makes some additional proffers concerning his alleged ties to the United States and Russia. (Docket No. 125 at 12-15). His counsel explains that Phan and his family left Russia for Israel when he was 8 years old after the fall of the Soviet Union and he has no family remaining in that country. (*Id.*). He does not speak Russian and has no legal status in that country. (*Id.*). He adds that he visited Russia twice as an adult on separate trips in 2009 and 2016, for a total of 8 days, and describes both trips as tourist visits to Moscow and St. Petersburg. (*Id.*). As

to his ties to the United States, he claims that in addition to owning property in California, he incorporated Melabes Corporation there in April 2018 with one of his proposed custodians, presumably Elbaz. (*Id*. at 13). He adds that he spent "months" in the United States prior to his arrest in May of 2019 but does not further describe his activities. (*Id*.). He has not offered any explanation for his international travel to other countries noted on the bond report, including the United Kingdom, Romania, or Brazil – which was where codefendant Prihar was residing during the offense conduct. (*See* Docket Nos. 116; 125).

Phan next provides correspondence from Department of Justice Trial Attorney Mark Aziz to Israeli authorities as part of the extradition process wherein Mr. Aziz explains that Phan and his coconspirator Prihar allegedly "engaged in thousands of transactions as part of the money laundering conspiracy," i.e., they actually carried out their money laundering scheme, and that the Government exercised its prosecutorial discretion to charge the case as a single conspiracy count as opposed to thousands of separate money laundering counts. (Docket No. 138-1). Phan also contests the Government's position that 570 Bitcoin which has not been seized or recovered by law enforcement was attributable to him and claims that it was placed in cold storage by his codefendant Prihar. (Docket No. 138). He cites to the affidavit of Special Agent Eric Yingling dated May 2019 which led to the seizures from cryptocurrency and other bank accounts, a review of blockchain records pertaining to the cryptocurrency cited therein, and the Government's opposition to Prihar's motion for compassionate release wherein counsel pointed out that Prihar had not been cooperative in assisting the Government in recovering the cryptocurrency so that it could be applied to the approximately $8 million criminal judgment in his case. (Docket No. 138 at 6-7).

In demonstrative Exhibit 2, titled Stylized Graph of Bitcoin Transfers, Phan proffers information which he believes relates to the 570 Bitcoin which were not recovered by law enforcement.  (Docket No. 138-2). The diagram shows an initial transaction on December 27, 2018, which was the day that a search warrant was executed at Prihar's residence in Brazil; and later transfers on February 8, 2019, around the time that Prihar had purchased cold storage devices on Amazon; April 8, 2019, before the seizure warrant was issued by this Court; and a subsequent transfer on July 3, 2019.  (Docket No. 138-2).  However, Phan does not explain how the July 3, 2019 Bitcoin transfer is attributable to Prihar, who was arrested in Paris in May of 2019 and detained at the time pending his own extradition to the U.S.  On the other hand, Phan had been released on bond by Israeli authorities in May of 2019.  (Docket No. 116-3 at ¶¶ 4-14). In any event, the Court accepts that the 570 Bitcoins were not recovered by law enforcement and are worth millions, even with the recent fluctuations in the market price.  (*See Yingling Aff.*, Mag. Nos. 19-1109-1124 at ¶ 11.g. ("As of April 17, 2019, one bitcoin is worth approximately $5,036.17…"); Docket No. 109 at 24-25 (Agent Mayotte testifying that at the exchange rates on October 29, 2025, 570 bitcoin were worth "[a]pproximately 60 million" in U.S. dollars)).

While Phan denies involvement, the Yingling affidavit provides additional information pertaining to Phan and his alleged role in the money laundering scheme. *See Yingling Aff.*, Mag. Nos. 19-1109-1124.  Among other things, Prihar set up the web domain www.deepdotweb.com through GoDaddy.com using his gmail account, a PayPal account and a Visa credit card and his emails show that he was the administrator of the website.  (*Id*. at ¶ 17).  Yingling states that Phan is connected to the DeepDotWeb site, its social media accounts, and Prihar through his own gmail account and a backup email address from an Israeli company where he previously worked that provides search engine optimization and social media optimization services.  (*Id*. at ¶ 21).

13

According to Yingling, Phan's emails show that he was "addressing DDW website technical challenges, including backup services, problem tickets, and programming issues." (*Id*. at ¶ 22). Both Phan and Prihar received invoices for website infrastructure that were addressed to Phan in their respective email accounts. (*Id*. at ¶¶ 21-22). Yingling further avers that "emails between Prihar and Phan confirm that both men were actively involved in the administration of DDW, with Phan serving as technical administrator and Prihar controlling most of the day-to-day operation." (*Id*. at ¶ 22). It also appears that one or both of them communicated with darkweb administrators using online account usernames or monikers to disguise their identities. (*Id*. at ¶¶ 35-37).

Yingling adds at a later point in the affidavit that "[w]hen [darknet marketplace] AlphaBay was seized by law enforcement, it was the largest criminal marketplace in operation, offering a vast platform for users to purchase illegal drugs, fraudulent identification materials, counterfeit goods, hacking tools, malware, firearms, and toxic chemicals. Notably, approximately 23.6% of all orders completed on AlphaBay were associated with an account created through a DDW referral link, meaning that DDW received an affiliate fee for 23.6% of all orders made on AlphaBay."[2] (*Id*. at ¶ 27). Specifically, "[b]etween August 20, 2015 and June 30, 2017, […] approximately 1689.466675," bitcoin was withdrawn from an AlphaBay account, (*id*. at ¶ 35), and placed in the

---

[2] The Court notes that the seizure of AlphaBay was publicized around the world and led to criminal charges being brought against several individuals. *See U.S. Department of Justice*, "AlphaBay, the Largest Online 'Dark Market,' Shut Down," *available at:* https://www.justice.gov/archives/opa/pr/alphabay-largest-online-dark-market-shut-down (last visited 3/3/2026); *see also Grasinger v. Caterpillar, Inc.*, Civ. A. No. 21-956, 2023 WL 4846843, at *1 (W.D. Pa. July 28, 2023) (quotation omitted) ("It is well established that this Court may properly take judicial notice of docket entries, documents, and opinions filed in other cases."). To that end, the creator and administrator of AlphaBay, Alexadre Cazares, a Canadian citizen living in Thailand was indicted in the U.S. District Court for the Eastern District of California at Cr. No. 1:17-CR-00144-LJO. *Id.* He was arrested in Thailand but committed suicide before being extradited to the U.S. *Id.* Bryan Connor Herrell, a Colorado man, served as a moderator on AlphaBay, pled guilty to one count of RICO conspiracy and was sentenced to 129 months' incarceration in the U.S. District Court for the Eastern District of California. *See United States v. Herrell*, Cr. No. 1:17-cr-00301-DAD-BAM-1 (E.D. Ca. Sept. 1, 2020). Another individual from Illinois, Ronald Wheeler, served as a public relations specialist for AlphaBay, pled guilty to conspiracy to commit access device fraud and was sentenced to 46 months' incarceration in the U.S. District Court for the Northern District of Georgia. *See United States v. Wheeler*, Cr. No. 1:17-cr-0377-LMM-1 (N.D. Ga. Jul. 31, 2018).

bitcoin Wallet 1 controlled by DeepDotWeb. (*Id*. at ¶ 37). Yingling also noted that his review of

emails between Prihar and Phan showed that:

> on July 11, 2017, Prihar and Phan discussed how the seizure of
> darknet marketplace AlphaBay would affect their business. Prihar
> assured Phan that he was prepared for this eventuality, and that as
> users migrated to other marketplaces, they would recover their
> previous income levels (from other marketplace kickbacks) within
> a month.

(*Id*. at ¶ 22).

All told, Yingling avers that darknet marketplaces sent 8,155 bitcoins to Wallet 1 which

was controlled by DeepDotWeb. (*Id*. at ¶¶ 38, 46). Relevant here, law enforcement then traced

some of the cryptocurrency to bitcoin companies where Phan specifically held accounts, including:

15 bitcoins at Spectrocoin.com; 4.9 bitcoins at Bittrex.com; approximately 26 bitcoins at Kraken

accounts; and, .5 bitcoin at Poloniex. (*Id*. at ¶¶ 48, 52, 54, 56). Law enforcement was also able to

connect Phan to Wallet 1 from information seized on his laptop, as explained below.

> On May 6, 2019, the Israeli National Police (INP) executed a search
> at Phan's residence in Israel pursuant to Israeli law. As a result of
> that search, two bitcoin wallet recovery seeds were identified on
> Phan's desktop computer. The first recovery seed was found in a
> .txt file named "TalNew.txt." Review of this wallet revealed it had
> received approximately 51 BTC from Wallet 1 on December 27,
> 2018. The second recovery seed was found in a .txt file named
> "Personal wallet.txt". Review of this walled revealed it had received
> approximately 36 BTC from Wallet 1 between August 7, 2017 and
> November 14, 2017.

(*Id*. at ¶ 39).

In his affidavit, Yingling further describes the process to convert bitcoin to regular or fiat

currency such as U.S. dollars or British pounds by setting up an account with a cryptocurrency

exchange such as Bitstamp, Kraken, Mt. Gox, or BTC-e, among others, and then moving funds

from a cryptocurrency account through the exchange account, converting the funds to fiat currency

and depositing them at a traditional bank. (*Id*. at ¶¶ 29; 60-65). Law enforcement was able to trace the cryptocurrency from Wallet 1 through these exchanges and observed its conversion to millions in fiat currency which was then deposited into various accounts held in the names of numerous entities controlled by Prihar as well as in his own name. (*Id*.).

Defendant's Motion has been fully briefed as the Court has also reviewed the Government's response, Defendant's reply, the Government's sur-reply, and Defendant's response to the sur-reply. (Docket Nos. 114; 119; 125; 132; 138). No further briefing has been requested and the Motion is now ripe for disposition.

## III.    LEGAL STANDARDS

A District Judge reviews the decision of the U.S. Magistrate Judge granting or denying bail *de novo*. *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985). The Court retains the discretion to make its determination after reviewing the record developed before the U.S. Magistrate Judge or to accept additional evidence from the parties and rule on the expanded record. *See e.g.,* 18 U.S.C. § 3142(f)(2)(B); *United States v. Burgess*, Crim. No. 09-150, 2009 WL 2038148, at *2 (W.D. Pa. Jul. 9, 2009). Here, the Court does not believe that a hearing is necessary as there is an extensive record supplemented by the proffers from the parties. Accordingly, the Court will decide the appeal on the basis of the existing record, as supplemented by the parties.

## IV.    DISCUSSION

The U.S. Court of Appeals for the Third Circuit has held that:

> Congress passed the [Bail Reform Act ("BRA")] to address whether and under what circumstances a district court may release a defendant pending trial. *See United States v. Salerno*, 481 U.S. 739, 742-43, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). It was enacted to ensure "all persons, regardless of their financial status, shall not needlessly be detained ... pending appeal, when detention serves neither the ends of justice nor the public interest." *United States v. Provenzano*, 605 F.2d 85, 87 n.13 (3d Cir. 1979) (quoting Bail

> Reform Act of 1966, Pub. L. No. 89-465 § 2, 80 Stat. 214, 214
> (1966)). The BRA […] requires the pretrial release of defendants
> unless 'no condition or combination of conditions will reasonably
> assure the appearance of the person as required and the safety of any
> other person and the community.' 18 U.S.C. § 3142(e)(1)).

*United States v. Soriano Nunez*, 928 F.3d 240, 244 (3d Cir. 2019). Relevant here, the BRA states

that a detention hearing shall be held upon a motion by the Government in a case that involves "a

serious risk that [the defendant] will flee." 18 U.S.C. § 3142(f)(2). It is the Government's burden

to demonstrate by a preponderance of the evidence that a defendant is a flight risk. *See United*

*States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986). In reaching a decision on release or detention,

the Court conducts an individualized assessment and weighs the evidence in light of the factors set

forth in 18 U.S.C. § 3142(g), i.e.:

> (1) the nature and circumstances of the offense charged […];
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--
>
>> (A) the person's character, physical and mental condition,
>> family ties, employment, financial resources, length of residence
>> in the community, community ties, past conduct, history relating
>> to drug or alcohol abuse, criminal history, and record concerning
>> appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the
>> person was on probation, on parole, or on other release pending
>> trial, sentencing, appeal, or completion of sentence for an
>> offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the
> community that would be posed by the person's release.

18 U.S.C. § 3142(g).

As a general matter, "individuals on release arising from other offenses and non-citizens

are treated the same as other pretrial criminal defendants under the BRA." *Soriano Nunez*, 928

F.3d at 244-45. "Thus, the presence of an ICE detainer and the threat of potential removal alone are not sufficient to deny BRA pretrial release." *Id*. at 245, n.4 (citing *United States v. Ailon-Ailon*, 875 F.3d 1334, 1338-39 (10th Cir. 2017)). Rather, the Court is tasked with weighing the evidence and conducting an individualized assessment of the § 3142(g) factors to determine if release on bond or detention is appropriate. *See* 18 U.S.C. §§ 3142(g)(1)-(4). While the Court acknowledges that both parties have cited cases involving other defendants in support of their respective positions and that the codefendant, Prihar, was held in pretrial detention during the prosecution of his case, decisions concerning other individuals are non-binding. Hence, the Court has conducted an individualized assessment of the bond factors and the risks of flight posed by the potential release of this particular defendant, Phan. *See e.g., See e.g., United States v. Oliver*, Crim. No. 16-40, 2016 WL 1746853, at *10-11 (W.D. Pa. May 3, 2016) ("the status of the coconspirators as released on bond and/or in pretrial custody does not bear directly on whether this Defendant should be released from custody as the same is not a specific factor under section 3142(g) which must be considered when making an individualized assessment of his eligibility for bail."); *United States v. Bey*, Crim. No. 15-87, 2016 WL 5121760, at *3 (W.D. Pa. Sept. 21, 2016) (noting that codefendant had been denied bail and the detention order had been affirmed in his case but that an individualized assessment had been conducted as to the defendant's eligibility for bail).

In this Court's estimation, the totality of the facts and circumstances demonstrate that the Government has proven by a preponderance of the evidence that Phan's release on bond under any conditions would present a serious risk that he will flee and not appear at criminal proceedings in this case. *See Himler*, 797 F.2d at 161. The Court has considered all of the parties' arguments and the extensive record in reaching this decision and now briefly highlights the pertinent evidence as to each of the above listed factors, in turn.

Initially, the nature and circumstances of the money laundering conspiracy offense indicate that there is a serious risk that Phan will flee the jurisdiction to avoid prosecution. *See Himler*, 797 F.2d at 161; *see also* 18 U.S.C. § 3142(g)(1). This is not a "run of the mill" money laundering case where the defendants were simply washing dirty money to conceal the criminal activity of others in exchange for a fee. Rather, Phan, Prihar, dark web marketplace administrators and others were allegedly involved in a sprawling and sophisticated international money laundering conspiracy for a period of six years (from 2013-2019) which generated approximately $15 million in kickbacks from unlawful sales of dangerous narcotics, firearms, stolen identity and account information, fake passports, malware and other illegal items on the dark web. (Docket No. 6). Phan and Prihar built a website, DeepDotWeb, that provided a gateway to individuals (both in the Western District of Pennsylvania and elsewhere) who wanted to buy such contraband from established sellers on hidden dark web marketplaces by connecting them via an accessible and public internet site. (*Id*.). In effect, Deepdotweb served as internet marketers for organized criminals operating on the dark web and earned a cut of the profits from such illegal activities. It appears that the entire scheme operated in the shadows with Prihar and/or Phan purportedly using online monikers (account names or ids) in communications with dark web administrators, exchanges of payments in cryptocurrency rather than traditional currency which may have prompted additional scrutiny and the movement of the illegal proceeds in thousands of transactions through cryptocurrency and bank accounts – some of which were held in the names of companies that they created for these purposes. (*Id*.).

In addition to the money laundering charge, the Government investigated other offenses committed on darknet marketplaces including for violations of U.S. narcotics, firearms, access device fraud and other laws. (*See* Docket No. 6 at ¶ 3). Despite identifying thousands of money

laundering transactions, prosecutors elected to bring a single money laundering conspiracy count against them. (Docket No. 138-1). With that said, the seriousness of the charge is reflected in the potential penalties which include a statutory term of incarceration of up to 20 years and, while Phan disputes the Government's computations, a potential advisory guidelines range of up to 151-188 months, if he is convicted at trial. (Docket No. 132 at 5). Accordingly, the possibility that Phan faces a significant prison sentence provides him with an incentive to flee and the clandestine nature of the alleged criminal activities involved here make it more likely than not that he will do so if provided the opportunity. *See* 18 U.S.C. § 3142(g)(1).

While Phan is presumed innocent of the money laundering conspiracy charge, it appears at this stage of the proceeding that the weight of the evidence against him is strong. *See* 18 U.S.C. § 3142(g)(2). Of course, the grand jury's return of the Indictment constitutes probable cause that Phan committed the charged offense. *See United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986). In addition, Prihar pled guilty to the same charge and was sentenced to 97 months' imprisonment, ordered to pay a special assessment of $100, and forfeited cryptocurrency and bank accounts, including a forfeiture money judgment up to $8.4 million. (Docket No. 74).

Phan suggests that Prihar was more culpable and that his strategic decision to plead guilty does not prove that Phan also committed a crime. (Docket No. 138 at 2, n.1). But, the transcripts from Prihar's proceedings show that he admitted that Phan was involved in the scheme and that Prihar pled guilty and accepted responsibility for his criminal conduct because he understood that it was wrong and unlawful. (*See* Docket Nos. 52; 82). At his change of plea hearing, Prihar admitted to conspiring with Phan, agreed that Phan served as the technical operator for DeepDotWeb, acknowledged that he and Phan engaged in cryptocurrency and other transactions for the purpose of concealing the fact that the funds were illegal proceeds and conceded that he

and Phan communicated on a daily basis to facilitate the criminal enterprise. (Docket No. 52 at

37-41). Prihar offered an extensive allocution at his sentencing hearing, wherein he stated, among

other things:

> Yes, Your Honor. I want to say a few things. Your Honor, when I started the website that brought me here, I was entering what seemed to me a technologically and legally unchartered water. I had no idea that what I was doing was anything wrong or forbidden.
>
> Later, as the time passed, and I did realize what I was doing, I kept doing it motivated by danger seeking, greed and fueled by constant drug use and I take full responsibility for all of that.
>
> …
>
> Your Honor, I know exactly what I did wrong. I accepted whatever I had to endure until now without asking why. I definitely deserved it, and I did what I could to try and make the right decisions during the legal process, no matter how strongly I felt against them, and I will definitely continue to do so.
>
> At this point, Your Honor, after all this time, I ask you to let me go back to my family, cure the wounds while they are still treatable and while the kids are still young. I want to build with them new life, new routine that will be law abiding and productive, especially in this changing time when everybody spend more time at home, my help is more urgent.
>
> I want to say sorry to anyone who was hurt as a result of my action and won't definitely, whatever imagine, do anything to put us through similar suffering again. I ask for Your Honor to send me back to my own country, culture and language and family where I fit in and live to the fullest of my positive and productive potential. Thank you, Your Honor.

(Docket No. 82 at 35-37).

To the extent that Phan claims he was unaware that the laundered funds were illegal

proceeds, the Government may prove his knowledge with evidence that he was willfully blind to

the scheme. *See United States v. Sherman*, 126 F.4th 224, 232 (3d Cir.), *cert. denied*, 145 S. Ct.

2721, 221 L. Ed. 2d 977 (2025) (quoting *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 420,

n.2 (3d Cir. 2013) ("Willful blindness 'is deemed to satisfy a scienter requirement of knowledge' where 'the defendant himself [was] subjectively aware of the high probability of the fact in question[.]'").  On this point, the Yingling affidavit states that Phan and Prihar emailed in 2017 about the fact that AlphaBay, the largest darknet marketplace at the time, was seized by law enforcement.  *See Yingling Aff.*, Mag. No. 19-1109:19-1124, at ¶ 22.  In these communications, Prihar assured Phan that they would be able to recapture their income from other darknet marketplaces and they then continued to run DeepDotWeb after this conversation for approximately two more years, earning additional millions in referral fees, as is detailed in the Indictment.  *Id.*; *see also* Docket No. 6 at ¶¶ 23-28 (noting that AlphaBay marketplace transactions ended on July 4, 2017 and detailing transactions by undercover FBI officers using DeepDotWeb referral links in September 2017 and April 2019).  The Government also traced cryptocurrency information from Phan's laptop computer back to the deposits of kickback referral fees generated by the DeepDotWeb site and seized 30 Bitcoins worth millions from Phan.  *See Yingling Aff.*, Mag. Nos. 19-1109:19-1124 at ¶¶ 39, 48, 52, 54, 56.  The parties agree that 570 Bitcoins (worth approximately $60 million) have not been recovered by law enforcement and while Phan suggests that Prihar moved it to cold storage, the transaction history indicates that the last transaction took place in July of 2019 at a time when Prihar was detained in France and Phan was released on bond in Israel.  (*See* Docket No. 138-2).

The Court recognizes that Phan has moved to dismiss the Indictment, challenging both venue and jurisdiction in this District and has stated his intention to raise other defenses to the charge.  (*See* Docket Nos. 130; 131; 143).  The Court will address such arguments separately after all briefing has concluded.  With that said, the Indictment broadly alleges that Phan conspired with Prihar, darknet marketplace administrators, and others to launder money in the Western District of

Pennsylvania and elsewhere. (*See* Docket No. 106). The U.S. Court of Appeals for the Third Circuit has held that "the government can generally prosecute a conspiracy offense 'in any district in which such offense was begun, continued, or completed,' 18 U.S.C. § 3237(a), or 'wherever a co-conspirator has committed an act in furtherance of the conspiracy.'" *Sherman*, 126 F.4th at 233 (quoting *United States v. Renteria*, 903 F.3d 326, 329 (3d Cir. 2018) (further quotation omitted). Hence, the Court does not focus on Phan's individual conduct directed to the United States but looks more broadly at the conduct of all of the conspirators involved in the scheme to determine whether venue and jurisdiction appropriately lie in this District. *See id*. ("Because the indictment alleged that at least part of the conspiracy took place in the Middle District of Pennsylvania, the District Court denied the motion."). Again, the codefendant Prihar, has pled guilty here. Moreover, the conspiracy allegedly included darknet administrators and other individuals. (Docket Nos. 6; 74).

In all, the Court finds that the weight of the evidence against Phan favors detention. 18 U.S.C. § 3142(g)(2).

Next, the evidence of Phan's history and characteristics likewise establishes by a preponderance that there is a serious risk that he will flee and not appear for court. *See* 18 U.S.C. § 3142(g)(3). In Defendant's favor, it is uncontested that he has no prior criminal convictions, no significant physical or mental health issues, and no record of violating conditions of release or failing to appear for court during the lengthy Israeli criminal proceedings. *See* 18 U.S.C. § 3142(g)(3)(A). With that said, those factors are outweighed by the other evidence demonstrating that he is a flight risk. *See Himler*, 797 F.2d at 161.

In this Court's opinion, Phan has significantly stronger ties to foreign countries than he does to the United States which weighs against his request for bond. *See Pretrial Bond Report* at

1-2; *see also* Docket No. 125 at 12-15.  Phan is a citizen of Israel, has lived there since he was 8 years old, has family and friends there, formerly ran a business there which is now in bankruptcy proceedings, is being actively prosecuted for tax and money laundering offenses in Israel, and has completed his legal studies at a university in that country.  (*Pretrial Bond Report* at 1-2; Docket Nos. 116-3 at ¶¶ 15-18; 125).  Given Phan's strong familial and community ties to Israel, his compliance with orders of Israeli courts is unremarkable.  (*See* Docket No. 116-3 at ¶¶ 4-14). Although the United States and Israel have an extradition treaty, the record reflects that Phan had no desire to leave Israel to defend the instant charge and the lengthy extradition proceedings in Israel caused significant delays in this case as he arrived in the United States more than 6 years after the Indictment was returned.  (*See e.g.*, Docket Nos. 6; 95-97; 116).  Phan also has ties to Russia as he was born in the former Soviet Union and took two trips there as an adult, including one in 2016 while DeepDotWeb was operational, and the alleged money laundering scheme was ongoing.  (*See Pretrial Bond Report* at 2; Docket No. 125 at 12-15).  Of course, Russia and the United States have no extradition treaty.  (Docket No. 109 at 71).  He has also traveled internationally to the United Kingdom, Romania and Brazil – where his alleged coconspirator Prihar lived during the course of this conspiracy.  (*See Pretrial Bond Report* at 2).

Phan suggests that he can surrender his Israeli passport to the U.S. Probation Office and this would preclude him from traveling internationally and mitigate the potential risk of flight. (*See* Docket Nos. 116; 125).  Yet, that is not a full proof plan as another defendant in a prior matter before this Court had dual U.S.-Israeli citizenship and was able to obtain an Israeli passport while released on bond.  *See United States v. Ratchkauskas*, Cr. No. 11-14, Docket No. 405 (W.D. Pa. Mar. 9, 2015).  In that circumstance, the Israeli passport was issued without any notification to the State Department and the defendant was only apprehended because he also attempted to obtain an

expedited U.S. passport which triggered a notification to law enforcement. *See United States v. Ratchkauskas*, Cr. No. 15-75, Docket No. 1 (W.D. Pa. Mar. 4, 2015). As the Government references, the conspirators involved in this money laundering scheme included darknet marketplace administrators who worked with vendors selling fake U.S. passports, stolen identity and account information and other items on the dark web that would be helpful in fleeing the jurisdiction.

Moving on, Phan has limited ties to individuals living in the United States – two cousins who live hundreds of miles away in Florida and New Jersey and a friend/attempted business associate in California. (Docket Nos. 109 at 45-52; 116-2). He now claims that he incorporated a business with Elbaz in California in 2018 but Elbaz downplayed any business involvement with Phan during his testimony and did not mention Melabes Corporation. (*See* Docket Nos. 125 at 13 ("He owns a substantial property in California. He incorporated a business there—Melabes Corporation—with one of his proposed custodians in April 2018.")); 109 at 48 (Elbaz testifying - "No, no. So there is no business relationship at that time. But in the past, we supposed to do some businesses, but it didn't go through. It's mostly friendship.")). Phan owns real estate in California worth $380,000 which is apparently beyond the reach of the trustee in the Israeli bankruptcy proceedings as he is attempting to post it as security for a bond in this case. (Docket Nos. 116; 125). Magistrate Judge Dodge was told that Phan had trips to Miami and Las Vegas in the past without much detail, but he now claims in the briefing on this motion that he spent "months" in the United States prior to his arrest in May of 2019. (*See* Docket Nos. 109 at 17-19; 125 at 13). In any event, Phan's only connections to the Western District of Pennsylvania are his alleged involvement in the charged offense, his prosecution in this Court and his current detention in a

facility located in the Western District of Pennsylvania. The lack of any meaningful ties to this jurisdiction undermines Phan's request for pretrial release. *See* 18 U.S.C. § 3142(g)(3).

Next, Phan's lack of recent work history and inability to work lawfully in the United States further weigh against his request for bond. *See id.* He recently completed his law degree in Israel and proffers that he intends to pursue an L.L.M. remotely from the same university in Israel. (Docket No. 125). Yet, he has been unemployed since 2021 and his only income (now $2,450 a month) is from renting his apartment in Tel Aviv. (*See Pretrial Bond Report* at 2-3; Docket No. 116 at 18). Phan told the Probation Office that his prior employment was as a lecturer and business owner, but the Bond Report does not include that he previously worked for an Israeli company that specialized in search engine optimization and social media optimization which is set forth in the Yingling affidavit. (*See Pretrial Bond Report* at 2; *see also* Yingling Aff. at ¶ 22). Phan initially proposed that he intended to work remotely for his Israeli-based lawyers from an apartment in downtown Pittsburgh. (*See Pretrial Bond Report* at 2; Docket Nos. 99; 109). However, he does not have a visa authorizing him to work in this country such that he, in effect, is proposing that he violate U.S. immigration and employment laws while on bond. *See e.g., United States v. Diaz-Garcia*, Crim. No. 25-4, 2025 WL 814359, at *9 (W.D. Pa. Mar. 14, 2025) ("this Court has held in cases involving U.S. citizens that work performed 'under the table' is not legitimate and therefore cannot conclude that Defendant was engaged in lawful employment because he is a non-citizen who lacks a visa authorizing him to work in this country"); *United States v. Hammond*, Cr. No. 16-121, 2016 WL 7384175, at *3 (W.D. Pa. Dec. 21, 2016) ("Because the Pretrial Services/Probation Office is unable to verify such employment, the Court concludes that Defendant lacks verifiable legitimate employment."). It is troubling to the Court that an attorney (foreign or otherwise) would propose to employ Phan in any capacity without conducting

a basic investigation of immigration and employment laws here in the United States.  *See Diaz-Garcia*, 2025 WL 814359 at *9.  Phan also has an ICE detainer and it is unclear how he would resolve same if he were granted bond in this case.  (*See* Docket Nos. 109; 116; 125; 132).

The Court further questions several aspects of the proposed alternative release plans that Phan be released to live in an apartment in Squirrel Hill or an apartment owned by a cousin in New Jersey.  (*See* Docket Nos. 116; 125).  The parties' submissions do not indicate that Pretrial Services has visited and approved these residences.  (*Id.*).  It appears to the Court that both proposals lack a traditional third-party custodian, i.e., a family member or close friend who is an upstanding U.S. citizen, lives in the residence with the releasee, has no firearms, narcotics or other illegal or dangerous items in the residence, and certifies to the Court that he or she will alert Pretrial Services if the releasee commits any violations of release conditions.  *See e.g., United States v. Atkins*, Crim. No. 15-87, 2015 WL 4920831, at *6 (W.D. Pa. Aug. 18, 2015) (rejecting release plan as pretrial services had never visited residence and the proposed third party custodian's work and childcare schedule made her unavailable to serve in that role for large portions of time and "the mere fact that a relative or other individual is willing to serve as a third party custodian for a defendant is not sufficient to justify release on such conditions").  Although the defense proffers that its witnesses, Rabbi Vogel, landlord Kashi and his cousin Davit, could provide additional information in support of these proposals, the Court does not believe that a further hearing is necessary because these options are deficient and do not satisfy the Court that release to any of the proposed residences would be appropriate.

As to the Squirrel Hill apartment, neither Rabbi Vogel of the Aleph Institute nor the landlord, Kashi, live at the residence on Hobart Street and the other tenants are generally described as individuals who are currently on "state probation or parole," and are presumably being

supervised by state probation and/or parole officers. (Docket No. 116-1). The Court has not been provided with any information about the other tenants, including their crimes of conviction, such that the Court cannot assess the risk that residing with them in the community would pose and the Court is otherwise strongly disinclined to permit Phan's release to a residence with other unidentified individuals who are involved in the criminal justice system and actively being supervised. (*See* Docket Nos. 116; 125; 138). It further appears to the Court that the landlord has a conflict of interest because he would be collecting rent from Phan at the same time he would be supervising him. (Docket No. 116 at 18). More importantly, none of these individuals (including the co-tenants) have any connection to Phan prior to this case, it is unclear if they have even met with or spoken to him at this point, they are not assisting with posting bond or other security, and it appears that they have no real incentive to contact Pretrial Services or law enforcement in the event of a violation or a crime. (*See* Docket Nos. 116; 125; 138).

The New Jersey proposal is similarly flawed for many of the same reasons. First, Fort Lee, New Jersey is located across the Hudson River from downtown Manhattan and this Court has denied release petitions from other defendants with release plans proposing that they live with family outside the Court's jurisdiction. *See Diaz-Garcia*, 2025 WL 814359, at *10 ("In any event, Warrenton, Virginia is well outside of this Court's jurisdiction and Defendant has not lived there for more than 2 years, making his release to that area inappropriate."); *see also United States v. Ewell*, No. CRIM. 13-125, 2013 WL 4479029, at *3 (W.D. Pa. Aug. 20, 2013) (rejecting release plan, in part, because "Defendant also proposes that he live outside this Court's jurisdiction in North Carolina, making his appearances in this District for court proceedings somewhat more difficult than an individual who is released within the District."). Second, Phan proffers that his cousin who owns the New Jersey apartment, Davit, would testify that he could live there and be

supervised by another unnamed cousin who lives in the same building. (*See* Docket Nos. 116; 125). However, Davit lives in Miami and any information that he could provide would not address whether the unnamed cousin would be an appropriate individual to serve as a third-party custodian. (*Id*.). Third, Fort Lee, New Jersey and the surrounding areas are close to three major international airports from which Phan could flee if provided the opportunity. Regardless, Phan has never lived in New Jersey, has weak connections to that District, and no arrangements have been made for the U.S. Probation Office in the District of New Jersey to provide courtesy supervision if Phan were to be released in that area. (*See* Docket Nos. 116; 125; 138).

All told, the evidence of Phan's history and characteristics does not support his release on bond. *See* 18 U.S.C. § 3142(g)(3)(A)-(B). To the contrary, the record demonstrates that Phan: is an Israeli citizen with no real connection to this District and limited ties to the U.S.; has strong ties to foreign countries and a history of international travel; has more than sufficient funds to flee given his real estate parcel in California and rental income from his Tel Aviv apartment; and faces criminal cases with potentially long prison sentences in both the U.S. and Israel as well as bankruptcy proceedings in Israel. While Phan advocates that he is incentivized to appear in an effort to recover the 30 Bitcoin that he contends was wrongly seized by the Government, the Court disagrees as he delayed these proceedings for nearly 6 years by contesting extradition and it also appears to the Court that 570 Bitcoins were not seized by law enforcement and remain outstanding. Collectively, such facts show that Phan's release under any conditions would pose a serious risk of flight to avoid prosecution.

Fourth, as to the nature and seriousness of the danger to any person or the community that would be posed by the person's release under § 3142(g)(4), the Court acknowledges that a violation of the charged money laundering statute, 18 U.S.C. § 1956(h) is not inherently dangerous or

violent.  However, it is alleged that Phan conspired with Prihar to build the DeepDotWeb site which provided internet-based marketing for darknet marketplace administrators and facilitated their sales of dangerous narcotics, firearms, stolen account and identity information, fake passports, malware and other items that harm the community.  (Docket No. 6).  They were purportedly compensated millions for referring customers to the darknet marketplaces.  (*Id*.).  The conspiracy was also longstanding as it allegedly took place over a period of 6 years (from 2013 to 2019) and Phan and Prihar continued to operate after AlphaBay was shut down.  *See e.g., United States v. Provenzano*, 605 F.2d 85, 95 (3d Cir. 1979) ("a defendant's propensity to commit crime generally, even if the resulting harm would be not solely physical, may constitute sufficient risk of danger to come within the contemplation of the [Bail Reform] Act.").  Given same, there is some risk of danger to the community if Defendant is released, favoring detention.

For all of these reasons and after carefully weighing all of the facts of record, the Court concludes that the Government has sufficiently established by a preponderance of the evidence that releasing Defendant on bond with any conditions presents a serious risk that he will flee and/or not appear for Court.  *See Himler*, 797 F.2d at 161.

V.    CONCLUSION

Based on the foregoing, Defendant's Motion [116] is DENIED, the Magistrate Judge's detention order [107] is affirmed, and Defendant is ordered detained pending trial.  An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

Dated:          March 4, 2026

cm/ecf:         All counsel of record